UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GERALDO MORALES,                                           :

        Petitioner,                                  :     04 Civ. 305 (DAB) (GWG)

  -v.-                                                   :     REPORT AND
                                                                                                                          RECOMMENDATION
GLENN S. GOORD, Commissioner, New York          :
State Department of Correctional Services
                                                           :
        Respondent.
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Geraldo Morales, proceeding pro se, brings this petition for writ of habeas corpus challenging his conviction in the Supreme Court of the State of New York, Bronx County, for Arson in the Second Degree (New York Penal Law § 150.15) and Unlawful Imprisonment in the Second Degree (New York Penal Law § 135.05). As a second felony offender, Morales was sentenced to a term of fifteen years. He is currently incarcerated at the Southport Correctional Facility in Pine City, New York. For the reasons stated below, Morales's petition should be denied.

I. BACKGROUND

    A. Evidence Adduced at Trial

      Morales met Jose Antonio Ayala in December 1997 at a shelter on Ward's Island and the two men began an intimate relationship. (Ayala: Tr. 151-52).[1] In April 1998, Morales was arrested and incarcerated for a parole violation. (See Ayala: Tr. 159, 161). Ayala visited

---

    [1] The transcript of the proceedings held May 17-19, 2000 is cited "Tr." The transcript of proceedings for May 22-23, 2000 is cited "Tr. II." The transcript of the proceedings held May 16, 2000, consisting of the pre-trial suppression hearing, is cited as "H."

Morales at Rikers Island and the Bronx House of Detention through the end of April. (Ayala: Tr. 161-62). He stopped visiting in early May because when he told Morales that he had found a new apartment, Morales demanded that Ayala give him Ayala's rent money. (Ayala: Tr. 161-62, 169-70). Ayala did not tell Morales that he would not visit him again and did not see him in person until August of that year. (Ayala: Tr. 154, 162-63, 169). At that point, Ayala had moved into a fifth floor apartment at 565 East 178th Street in the Bronx. (Ayala: Tr. 154, 162-63).

On August 31, 1998, Hector Andino, a friend of a man named Cceo who lived in Ayala's building, noticed a man he later identified as Morales standing outside of Ayala's building at about 10:30 a.m. (Andino: Tr. II 71-73, 77). Andino was outside of the building and had called up to Cceo, who then stuck his head out of the window. (See Andino: Tr. II 73-74). Andino did not speak to Morales, but he overheard Morales muttering to himself in Spanish, "[N]ow I know why she stopped going to see me, and I know who she is," and that he knew "who she was playing dirty with." (Andino: Tr. II 72-73; accord id. 74-75, 81). Andino also heard Morales say, "I know where he lives at and I'm going to get him." (Andino: Tr. II 75). Andino observed Morales continuing to stand outside the building while he was hanging out in the yard next door until approximately 11:45 a.m. (Andino: Tr. II 82).

That same day, Ayala saw Morales outside of his apartment building on his way home from the store. (Ayala: Tr. 154-55). Ayala and Morales began arguing, and Morales called Ayala names and accused him of having another lover. (Ayala: Tr. 155-56). At some point during the argument, Ayala invited Morales into the apartment building so that he could return documents to Morales that he had kept for him while he was in prison. (Ayala: Tr. 155-56, 158-59, 185-86). Morales followed Ayala inside, pushing him up the stairs and slapping him outside

of the apartment. (Ayala: Tr. 156-57). After Morales slapped Ayala, Ayala slapped Morales and then Morales pushed Ayala inside the apartment and took his keys. (Ayala: Tr. 157-58). Morales then pushed Ayala into the bedroom and blocked the door with a chair so that both men were inside the bedroom. (Ayala: Tr. 163, 165-67).

Morales and Ayala remained in the bedroom for the next two days, Morales leaving the room only once to get food from the kitchen. (Ayala: Tr. 170-73). During this time, Morales insulted Ayala, accused him of being Cceo's lover, and threatened to kill him, although he never hit Ayala and did not tie him up. (Ayala: Tr. 167-69, 187-89). At one point, Ayala grabbed a knife, but Morales succeeded in taking it away from him and Ayala sustained scratches on his hand as a result of the struggle. (Ayala: Tr. 187-88, 203-04; Martinez: Tr. 93).

On the morning of September 2, 1998, Morales left the bedroom to go to the bathroom. (Ayala: Tr. 173). Once Morales left the room, Ayala ran out of the apartment and fled to his friend Carmen Martinez's apartment, which was five or ten minutes away. (Ayala: Tr. 173-74). He subsequently called the police and Morales's parole officer from Martinez's apartment. (Ayala: Tr. 176).

Some time after Ayala arrived at Martinez's apartment, a man showed up outside Martinez's window and began calling for Ayala. (Martinez: Tr. 95-96; Caraballo: Tr. 122; Ayala: Tr. 174-75, 198). Martinez's daughter-in-law, Evelyn Caraballo, went to the window and said that Ayala was not there. (Martinez: Tr. 96; Caraballo: Tr. 122). At some point thereafter, the man knocked on Martinez's door and again asked for Ayala. (Martinez: Tr. 112; Caraballo: Tr. 124). When Caraballo repeated that Ayala was not there, the man said, "[I]f you see him, tell him I'm going to kill him and I'm going to burn his house," and left. (Caraballo: Tr. 124). At

3

trial, Caraballo identified Morales as the man who showed up at the door and testified that she had previously identified him at a line-up. (Caraballo: Tr. 124-25, 135-38).

Later that afternoon, Siew Gajadhar, a resident of Ayala's building, heard a man on the street yelling for "Jose," and from his window saw the man staring up at the fifth floor where Ayala lived. (Gajadhar: Tr. II 91-94, 96). He passed the same man on his way to and from a trip to the store, and then passed him again while heading down the stairs on his way to work around 2:45 p.m. (Gajadhar: Tr. II 95-100). As he left the apartment on his way to work, Gajadhar noticed that the man was carrying a brown shopping bag under his arm. (Gajadhar: Tr. II 98). Gajadhar did not return to the building until approximately 11 p.m. when he returned from work. (Gajadhar: Tr. II 101, 103). In court, Gajadhar identified Morales as the man he had seen near his building. (Gajadhar: Tr. II 92, 104).

A fire in Ayala's building was reported anonymously at 4:20 p.m. and fire marshals were assigned to investigate. (Brady: Tr. II 15, 17). Although Ayala's bedroom was extensively damaged, there was little damage to the rest of the apartment. (Brady: Tr. II 21, 30, 34). A fire marshal testified that he believed the fire was non-accidental based on evidence including a "pour pattern" and a "burn trail" indicating that the fire was accelerated by a flammable liquid. (See Brady: Tr. II 26-28, 32-33, 35-36).

In his defense, Morales called a fire debris analyst from the New York City Police Department who testified that he could not detect an accelerant in the debris. (See Trann: Tr. II 108, 114-15).

B. Pre-Trial and Evidentiary Rulings

1. Suppression Hearing

Prior to trial, the court conducted a suppression hearing to determine whether Morales's arrest was lawful and thus whether there was probable cause to suppress any subsequent identification procedures or evidence recovered from his person following the arrest. (See H. 7-35, 81). The testimony at the hearing was as follows:

On September 3, 1998, Police Officer Glenn Joyce was patrolling Borough Hall Park in the Bronx when he noticed Morales sitting on a park bench, drinking from a bottle in a brown paper bag. (H. 7-9, 14-15). Suspecting that Morales was drinking beer, he approached and asked for identification and then patted him down. (H. 9-10, 15-19, 22-23). As the officer was looking through Morales's parole papers, a man approached and said that Morales had set a fire the previous day. (H. 9). Officer Joyce told the man to find someone who had seen Morales at the scene of the fire and the man went off to find the building superintendent. (H. 9-10). When the superintendent approached, Morales stood up and attempted to run away. (H. 10). Officer Joyce subdued Morales, slamming his head on the park bench and placing him under arrest. (See H. 10-11, 13, 28). As a result of injuries sustained during the arrest, Morales had to be taken to the hospital to be treated before he was taken to the station house. (H. 13).

The trial court denied defense counsel's motion to suppress, concluding that Officer Joyce had probable cause to arrest Morales. (H. 81, 83-84).

2. Evidentiary Rulings

Just before trial, defense counsel moved to preclude testimony at trial that Morales was in jail shortly before the fire. (See Tr. 62). The court denied this application, finding that

5

presentation of this fact was "the only way the jury can really understand the relationship between the parties and what this argument may have been about." (Tr. 62). As the court explained, the "gravamen of this case, is the Defendant was upset with Mr. Ayala for not having gone to visit him at Rikers Island and also the suspicion . . . in [Mr. Ayala] taking on a new companion or a new relationship to the detriment of Mr. Morales and that caused the fight that ensued." (Tr. 62).

The court did, however, grant defense counsel's motion to preclude testimony that Ayala spoke to Morales's parole officer on the day of the fire. (Tr. 14-15, 63). Despite the judge's ruling, Ayala testified at trial that Morales was on parole, mentioned Morales's parole officer, and spoke about visiting Morales in prison. (Ayala: Tr. 159, 161-62, 176; see Tr. 180). Defense counsel did not object to Ayala's testimony while he was on the stand, but moved for a mistrial once Ayala finished testifying. (Tr. 180-81). The court stated that it would have been "preferable" if the fact that Morales had been on parole was not highlighted, but denied the motion because the information was part of the res gestae of the case. (Tr. 181-82). Defense counsel refused the court's offer of a curative instruction. (Tr. 182).

At the close of the prosecution's case, defense counsel moved to strike all of Andino's testimony as irrelevant and prejudicial, arguing that Andino was testifying to events that occurred several days before the fire and also because "he was testifying with respect to an uncharged crime." (Tr. II 105). The court denied this motion as well, finding that the evidence was relevant and served to corroborate Ayala's testimony. (Tr. II 105-06).

C. Jury Charge and Sentence

The jury found Morales guilty of arson in the second degree and unlawful imprisonment

in the second degree. (Tr. II 198). Morales was sentenced to a term of fifteen years as a second violent felony offender. Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus, filed Jan. 14, 2004 (Docket #2) ("Petition"), at 1; People v. Morales, 301 A.D.2d 368 (1st Dep't 2003).

D. Direct Appeal

Morales, represented by counsel, appealed his conviction to the Appellate Division, First Department and raised the following claims:

> The court allowed propensity evidence to overwhelm appellant's trial by (a) permitting the complainant to testify to appellant's incarceration prior to the fire and refusing to strike testimony that appellant had allegedly threatened complainant's new boyfriend; and (b) denying defense counsel's mistrial motion after the prosecutor elicited that appellant had been incarcerated for a parole violation. U.S. Const., amend. XIV; N.Y. Const. art. 1, § 6.
>
> The line-up identification of appellant should be suppressed because the excessively forceful arrest – "splitting" the appellant's head open – constituted an unlawful seizure. U.S. Const., amend. IV; N.Y. Const., art. 1 §§ 6, 12.

Brief for Defendant-Appellant, dated May 2002 (reproduced as Ex. 1 to Opposition, filed Feb. 2, 2005 (Docket #5) ("Opposition")) ("Def. App. Br."), at 15, 22. The government opposed the appeal. See Respondent's Brief, dated Oct. 2002 (reproduced as Ex. 2 to Opposition).

The Appellate Division affirmed Morales's conviction. Morales, 301 A.D.2d at 368. With respect to Morales's claim regarding the improper admission of propensity evidence, the Appellate Division held:

> Testimony about defendant's prior incarceration and purported threats to his ex-lover's new boyfriend was probative of defendant's motive and intent, was inextricably interwoven with the narrative of events, and was necessary background to explain to the jury the relationship between defendant and the victim. Specifically, defendant's incarceration was central to the events leading up to the charged crimes. While a curative instruction could have ameliorated any prejudice from the brief mention of defendant's parole status, defendant specifically declined such relief, and did not seek any remedy other than a

mistrial.

Id. (internal citations and quotation marks omitted). The court found Morales's additional claims "unpreserved" and "decline[d] to review them in the interest of justice." Id. The court added, "Were we to review these claims, we would reject them." Id.

On January 14, 2003, Morales sought leave to appeal to the New York Court of Appeals. See Affidavit of Leilani Rodriguez, dated Feb. 1, 2005 (attached to Opposition), ¶ 9. The Court of Appeals denied leave to appeal on February 26, 2003. People v. Morales, 99 N.Y.2d 617 (2003).

  E. The Instant Petition

Morales timely filed the instant petition for habeas corpus relief on January 14, 2004. See Petition. In his petition, Morales raises the same two grounds for relief that he raised in his appellate brief. See id. at 2-3. The government has filed papers in opposition to Morales's petition. See Opposition. Morales has not filed any papers in reply.

## II. APPLICABLE LEGAL PRINCIPLES

  A. Law Governing Petitions for Habeas Corpus Under 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d),

it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered "on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Sellan, 261 F.3d at 311-12.

In Williams v. Taylor, the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405-06 (2000). Williams also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable." Id. at 409.

Errors of state law are not subject to federal habeas review. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Rather, a petitioner must demonstrate that his conviction resulted from a state court decision that violated federal law. See, e.g., id. at 68.

9

III. DISCUSSION

    A. Introduction of Propensity Evidence

Morales argues that the trial court erred by permitting the introduction of the following: (1) evidence that Morales had been previously incarcerated; (2) Andino's testimony that Morales threatened to "get" Cceo; and (3) Ayala's testimony that Morales was guilty of a parole violation and had a parole officer. See Def. App. Br. at 15-20. Morales claims that the introduction of this testimony, which he characterizes as "propensity evidence," id. at 21, was so prejudicial that it prevented him from getting a fair trial. See id. at 20-21.

Rulings by state trial courts on evidentiary matters are generally a matter of state law and pose no federal constitutional issue. Roberts v. Scully, 875 F. Supp. 182, 189 (S.D.N.Y.) (citing Estelle, 502 U.S. at 67-69, 71-73; Spencer v. Texas, 385 U.S. 554, 562-63 (1967)), aff'd, 71 F.3d 406 (2d Cir. 1995); cf. Yapor v. Mazzuca, 2005 WL 894918, at *12 (S.D.N.Y. Apr. 19, 2005) (Report & Recommendation) ("[P]roper application of a presumptively constitutional state evidentiary rule could not be unconstitutional.") (citation omitted); Smith v. Artus, 2004 WL 789769, at *12 (S.D.N.Y. Apr. 14, 2004) (Report & Recommendation) (same), adopted by, Order, filed Nov. 10, 2004 (Docket #17 in 03 Civ. 6982). Even where there has been an erroneous ruling under state law, habeas relief is not available unless the alleged error resulted in a trial that "deprive[d] the defendant of fundamental fairness," thereby violating the defendant's constitutionally guaranteed due process rights. Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988); accord Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir.) ("The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice.") (internal

quotation marks and citation omitted), cert. denied, 525 U.S. 840 (1998); Sims v. Stinson, 101 F. Supp. 2d 187, 194 (S.D.N.Y. 2000) (noting that "[o]nly a very narrow class of infractions" where improper evidence was introduced at trial will violate fundamental fairness) (citation omitted), aff'd, 2001 WL 303750 (2d Cir. Mar. 28, 2001). To violate "fundamental conceptions of justice," the evidence "must have been sufficiently material to provide a basis for conviction." Dunnigan, 137 F.3d at 125 (citation and quotation marks omitted). The petitioner bears a "'heavy burden'" in seeking to establish that improperly admitted evidence deprived him of his right to a fair trial. Benitez v. Senkowski, 1998 WL 668079, at *5 (S.D.N.Y. Sept. 17, 1998) (quoting Roberts, 875 F. Supp. at 189).

Under New York law, evidence of uncharged crimes may not be used for the purpose of showing a defendant's propensity to commit the charged crime. See People v. Molineux, 168 N.Y. 264, 291 (1901). However, "when the evidence of the other crimes is relevant to an issue other than the defendant's criminal tendency, it may be admitted on the basis of an exception to the general rule." People v. Beam, 57 N.Y.2d 241, 250 (1982).

Here the three items of evidence were not offered to prove Morales's propensity to commit the charged crimes. With respect to Morales's incarceration, the court properly noted that the jury would not be able to understand the sequence of events if it was not made aware of the circumstances under which Morales complained that Ayala was not visiting him. (Tr. 62-63). The evidence was thus relevant to proving Morales's motive for committing arson and unlawful imprisonment. Because the evidence was relevant, there was no error of state law and certainly no violation of "fundamental fairness."

As for the testimony regarding Morales's parole violation, the court found that this

11

testimony had not been intentionally elicited by the prosecutor. (Tr. 181). Certainly, the fact that Morales had violated parole was not of any apparent relevance to any issue in the case and could properly have been excluded – as the trial court itself ruled with respect to the conversation with the parole officer. (Tr. 14-15, 63). Once the evidence came out, however, Morales's counsel declined any curative instruction. (Tr. 182). Under these circumstances, the Court again cannot view the admission of the evidence as violating "fundamental fairness."

Finally, with respect to Andino's testimony, the testimony was obviously relevant inasmuch as it showed that Morales had reason to be angry with Ayala based on his belief that he had a new lover. It also put Morales at the scene of the crime. Thus, the trial court properly found the testimony to be "relevant in every respect." (Tr. II 106). The Appellate Division too noted – both with respect to this testimony and the testimony about Morales's prior incarceration – that it was "'probative of defendant's motive and intent, was inextricably interwoven with the narrative of events, and was necessary background to explain to the jury the relationship between' defendant and the victim." Morales, 301 A.D.2d at 368 (quoting People v. Santiago, 295 A.D.2d 214, 215 (1st Dep't 2002)).

Notably, other cases have similarly concluded that evidence of prior bad acts of a defendant may be admissible where relevant and their admission does not warrant habeas relief. See, e.g., Hall v. Annets, 2004 WL 2028029, at *2 (E.D.N.Y. Sept. 7, 2004) (evidence that the defendant threatened to harm the victim's daughter properly admitted where it assisted the jury to understand the relationship between the parties and events leading up to the crime); Smith, 2004 WL 789769, at *11-*12 (admission of evidence suggesting drug-related motive for shooting proper under New York evidentiary rules and thus not an error of constitutional law); Williams v.

Philips, 2003 WL 21961127, at *6 (S.D.N.Y. Aug. 18, 2003) (evidence of co-defendants' uncharged crime properly admitted to explain foundation for testimony regarding events culminating in arrest of defendant).

In sum, Morales cannot show that the admission of the evidence deprived him of a fair trial.

B. Suppression Resulting from Allegedly Illegal Arrest

In his second claim for habeas relief, Morales argues that the manner in which he was arrested was "so unreasonable" that it constituted an illegal arrest and thus that the line-up identification should have been suppressed as the fruit of an illegal seizure. Def. App. Br. at 22. The Appellate Division held that this claim was unpreserved and declined to review it. See Morales, 301 A.D.2d at 368. In the alternative, the court stated that if it were to review this claim, it would reject it. Id.

It is not necessary to analyze whether the Appellate Division's ruling is sufficient to constitute a procedural default barring habeas review of Morales's claim. See generally Coleman v. Thompson, 501 U.S. 722, 729-30, 749-50 (1991); Harris v. Reed, 489 U.S. 255, 262 (1989) (citations omitted). Because the only federal issue raised by this claim is that Morales was the subject of an unreasonable seizure under the Fourth Amendment, it is barred by Stone v. Powell, 428 U.S. 465 (1976). Under Stone, a habeas petitioner is not entitled to relief if the state courts provided him with "an opportunity for full and fair litigation" of a claim under the Fourth Amendment. Id. at 481-82. Rather, a habeas petitioner's Fourth Amendment claims may be reviewed only if "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but

13

the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977)).

New York provides such a corrective procedure in the form of a suppression hearing. See N.Y. Crim. Proc. Law § 710 et seq.; see Capellan, 975 F.2d at 70 n.1 ("'[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'") (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)). Thus, only the second part of the test is applicable. Morales, however, makes no claim that he was precluded from using New York's suppression hearing procedure – and, indeed, he availed himself of that procedure here. The Second Circuit has squarely held that "once it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the [state] court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief." Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002). "[A] mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72.

Thus, this claim too cannot support habeas relief.

Conclusion

For the foregoing reasons, Morales's petition should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure,

the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Deborah A. Batts, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Batts. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).

Dated: June 10, 2005
New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Geraldo Morales
No. 00-A-4319
Southport Correctional Facility
P.O. Box 2000, Institution Road
Pine City, New York 14871

Leilani Rodriguez
Karen Swiger
Assistant District Attorneys
Bronx County
198 E. 161st Street
Bronx, NY 10451

Hon. Deborah A. Batts
United States District Judge

the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Deborah A. Batts, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Batts. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).

Dated: June 10, 2005
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Geraldo Morales
No. 00-A-4319
Southport Correctional Facility
P.O. Box 2000, Institution Road
Pine City, New York 14871

Leilani Rodriguez
Karen Swiger
Assistant District Attorneys
Bronx County
198 E. 161st Street
Bronx, NY 10451

Hon. Deborah A. Batts
United States District Judge